**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**ADAM DESIMONE,**

**Plaintiff,** **No. 2:24-cv-01466-NR**

v.

**GS LABS, LLC, DANIEL WHITE, CHRISTOPHER ERICKSON and GABRIEL SULLIVAN,**

**Defendants.**

**AMENDED COMPLAINT**
**AS OF COURSE PURSUANT TO FED.R.CIV. P. 15 (a) (1)**

AND NOW, the Plaintiff, Adam DeSimone, by his attorneys, James R. Cooney, Ryan J. Cooney and Paul R. Toigo, files the within Amended Complaint:

**The parties:**

1. The Plaintiff, Adam DeSimone (DeSimone), is an adult individual residing in Washington County.

2. The Defendant, GS Labs, LLC (GS Labs) is a Nebraska limited liability company with offices at 222 South 15th Street, Suite 1503N, Omaha, NE 68102.

3. The Defendant, Daniel ("Danny") White (White), is an adult individual with offices at 222 South 15th Street, Suite 1503N, Omaha, NE 68102.

4. The Defendant, Christopher ("Chris") Erickson (Erickson), is an adult individual with offices at 222 South 15th Street, Suite 1503N, Omaha, NE 68102.

5. The Defendant, Gabriel ("Gabe") Sullivan (Sullivan), is an adult individual with offices at 222 South 15th Street, Suite 1503N, Omaha, NE 68102.

**Jurisdiction:**

6. This Honorable Court has jurisdiction over the within matter pursuant to *28 U.S.C. 1332* based upon diversity of citizenship.

**Facts supporting *in personam* jurisdiction:**

7. The Courts in the Commonwealth of Pennsylvania have *in personam* jurisdiction over GS Labs. GS Labs registered to do business as a foreign limited liability company with the Secretary of State of the Commonwealth of Pennsylvania. Such registration, in and of itself, is sufficient to support the exercise of personal jurisdiction. See, *Mallory v. Norfolk Southern Railway Co.,* 600 U.S. 122, 143 S. Ct. 2028, 216 L. Ed. 2d 815 (2023).

8. The Courts in the Commonwealth of Pennsylvania have *in personam* jurisdiction over White. Among other things:

A. White purposely recruited DeSimone, a citizen of the Commonwealth of Pennsylvania, to set up testing labs within the Commonwealth of Pennsylvania. DeSimone's cause of action is directly related to White's activity. See, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Mendel v. Williams,* 2012 Pa. Super. 171, 53 A.3d 810 (2012).

B. White sent numerous text messages and E-mails to DeSimone in the Commonwealth of Pennsylvania for the purpose of forming a contract to be performed within the Commonwealth of Pennsylvania. See, *Burger King, supra;*

*Herbert v. Pouya,* 2021 U.S. Dist. LEXIS 83859 (W.D. Pa. 2021); *GE v. Deutz AG,* 270 F.3d 144 (3d Cir. 2001); *Telecordia Tech, Inc. v. Telkom SA Ltd.,* 458 F.3d 172 (3d Cir. 2006).

C. White sent E-mails to DeSimone promising to pay DeSimone for his services performed within the Commonwealth of Pennsylvania.

D. White promised to pay DeSimone $50 per test for each test administered in the Commonwealth of Pennsylvania.

E. White is a founder and member of Rocket Car Wash which owns and operates car washes in Pittsburgh, PA.

F. White owns real estate located on the South Side as well as a parcel in Monroeville.

G. White owned P & W Motors in Shadyside.

H. White was a resident of the City of Pittsburgh for 15 years and he continues to visit Pittsburgh frequently.

9. The Courts in the Commonwealth of Pennsylvania have *in personam* jurisdiction over Erickson. Among other things:

A. Erickson purposely recruited DeSimone, a citizen of the Commonwealth of Pennsylvania, to set up testing labs within the Commonwealth of Pennsylvania. DeSimone's cause of action is directly related to Erickson's activity. See, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Mendel v. Williams,* 2012 Pa. Super. 171, 53 A.3d 810 (2012).

B. Erickson sent numerous text messages to DeSimone in the Commonwealth of Pennsylvania for the purpose of forming a contract to be performed within the Commonwealth of Pennsylvania. See, *Burger King, supra; Herbert v. Pouya,* 2021 U.S. Dist. LEXIS 83859 (W.D. Pa. 2021); *GE v. Deutz AG,* 270 F.3d 144 (3d Cir. 2001); *Telecordia Tech, Inc. v. Telkom SA Ltd.,* 458 F.3d 172 (3d Cir. 2006).

C. Erickson paid contractors to set up the testing sites in the Commonwealth of Pennsylvania.

D. The Commonwealth of Pennsylvania required a CLIA testing license in order to perform Covid-19 testing in the Commonwealth of Pennsylvania. Erickson drafted a letter to Governor Tom Wolf requesting the Governor's assistance to obtain the CLIA testing license.

E. Erickson made phone calls to the Governor's office in connection with the CLIA testing license.

F. Erickson made phone calls to various landlords in connection with the Pittsburgh testing sites.

G. Erickson is a founder and member of Rocket Car Wash which owns and operates car washes in Pittsburgh, PA.

10. The Courts in the Commonwealth of Pennsylvania have *in personam* jurisdiction over Sullivan. Among other things:

A. Sullivan purposely recruited DeSimone, a citizen of the Commonwealth of Pennsylvania, to set up testing labs within the Commonwealth of Pennsylvania. DeSimone's cause of action is directly related to Sullivan's

activity. See, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Mendel v. Williams,* 2012 Pa. Super. 171, 53 A.3d 810 (2012).

B. Sullivan sent numerous text messages to DeSimone in the Commonwealth of Pennsylvania for the purpose of forming a contract to be performed within the Commonwealth of Pennsylvania. See, *Burger King, supra; Herbert v. Pouya,* 2021 U.S. Dist. LEXIS 83859 (W.D. Pa. 2021); *GE v. Deutz AG,* 270 F.3d 144 (3d Cir. 2001); *Telecordia Tech, Inc. v. Telkom SA Ltd.,* 458 F.3d 172 (3d Cir. 2006).

C. The Commonwealth of Pennsylvania required a CLIA testing license in order to perform Covid-19 testing in the Commonwealth of Pennsylvania. Sullivan sent a letter to Governor Tom Wolf requesting the Governor's assistance to obtain the CLIA testing license. In addition, Sullivan participated in a conference call with the Governor's office in connection with the CLIA testing license.

D. The Commonwealth of Pennsylvania required a doctor to sign off on the application for a CLIA testing license. DeSimone recruited Dr. Brian J. Deyarmin, a doctor with a practice in Bethel Park, PA to sign off on the license. Sullivan made all the financial arrangements with Doctor Deyarmin and arranged for payment to be sent to Deyarmin in Bethel Park.

E. Sullivan signed the Application for the CLIA License and sent the Application to the Pennsylvania Department of Health in Exton, PA.

**Venue:**

11. The Western District of Pennsylvania is the appropriate venue for this case since a substantial part of the events or omissions giving rise to DeSimone's claims occurred in Western Pennsylvania. See, *28 U.S.C. 1391 (b)(2).*

12. Venue is appropriate in the Western District of Pennsylvania since the contract at issue was accepted in Pennsylvania and DeSimone performed the services required under the contract in the Commonwealth of Pennsylvania. See, *Herbert v. Pouya,* 2021 U.S. Dist. LEXIS 83859 (W.D. Pa. 2021); *Myers v. Jani-King of Philadelphia, Inc.,* 2012 U.S. Dist. LEXIS 172782 (E.D. Pa. 2012); *Swill Beverages, LLC v. United States Distilled Products Co.,* 2015 U.S. Dist. LEXIS 168601 (E.D. Pa. 2015).

**Background:**

13. DeSimone is a successful businessman and restaurateur.

14. As such, DeSimone owns and operates several restaurants in the greater Pittsburgh area, including Social House 7, Spritzery, Penn Society, Standard Market & Pint House, Local Craft Kitchen & Bar and Avalon.

15. DeSimone met White as a Patron in 2006 after DeSimone opened a nightclub (Diesel). DeSimone met Erickson in 2019 in connection with a restaurant development in Omaha, NE. DeSimone met Sullivan (by phone and text) in the Fall of 2020 in connection with Defendants' proposal to expand GS Labs into the Ohio and Pennsylvania markets.

**GS Labs:**

16. GS Labs, LLC (GS Labs), is a Nebraska limited liability company with offices at 222 South 15th Street, Suite 1503N, Omaha, NE 68102.[1]

17. White, Erickson and Sullivan are the members of GS Labs.

18. White, Erickson and Sullivan formed GS Labs in early 2020 as a profit-making venture to administer COVID-19 rapid tests in the Omaha, Nebraska area.

19. GS Labs originally established two (2) rapid testing sites in Omaha.

20. As the need for rapid testing and the profitability of the operation became clear, GS Labs expanded its operations and ultimately opened more than 64 testing sites throughout the United States.

**The expansion into the Ohio/Pennsylvania market:**

21. In November of 2020, White, on his own behalf, and on behalf of Erickson and Sullivan, engaged in discussions with DeSimone regarding the Defendants' intentions to establish COVID-19 rapid testing sites in Ohio and Pennsylvania.

22. Such discussions included numerous phone calls, E-mails and text messages between White, Erickson, Sullivan and DeSimone.

23. White told DeSimone that they needed sites with at least 20 parking spaces, room for a mobile lab trailer and indoor space for 10 people to perform the tests.

[1] On January 21, 2021, GS Labs registered to do business within the Commonwealth of Pennsylvania.

24. White also told DeSimone that DeSimone could make at least $5 million in profit to open and operate the sites. On other occasions, White asserted that DeSimone would make in excess of $10 million.

**The oral agreement:**

25. On or about November 27, 2020, DeSimone and the Defendants entered into an oral agreement under which DeSimone would establish and oversee COVID-19 rapid testing sites in Eastern Ohio and the Greater Pittsburgh Area.

26. The oral agreement was made with White, Erickson and Sullivan for the benefit of GS Labs.

27. DeSimone relied upon the personal credit of White, Erickson and Sullivan when he agreed to the terms of the contract.

28. The terms of the oral agreement were as follows:

A. DeSimone would find appropriate locations for the new sites.

B. DeSimone would arrange for leases at the new sites and obtain all required zoning, building and occupancy permits.

C. DeSimone would obtain the required licenses and permits for the sites.

D. DeSimone would use his restaurant employees to open and operate the testing sites.

E. DeSimone would make arrangements with contractors for any construction that was required.

F. DeSimone would obtain appropriate signage for the new testing sites.

G. In exchange, the Defendants agreed to pay DeSimone $50.00 for each test administered. Defendants also agreed to pay DeSimone a commission of $15,000.00 for each site that he opened.

29. The Defendants assured DeSimone that DeSimone would earn a minimum of $5 million dollars for his efforts.

30. DeSimone relied upon such assurances when he agreed upon the terms of the deal.

31. The terms of the oral agreement were confirmed by various E-mails and text messages between the Defendants and DeSimone. In the E-mail and text exchanges, the Defendants referred to DeSimone as their partner.

32. Although the new sites would be opened in the name of GS Labs, DeSimone relied upon the personal promises (and the credit) of White, Erickson and Sullivan when he agreed to the deal.

**DeSimone performed under the terms of the agreement:**

33. In reliance upon the Defendants' promises, DeSimone opened and operated six (6) testing sites in the following locations:

A. Rocky River, Ohio.

B. Columbus, Ohio. White specifically directed DeSimone to open the testing site in Columbus and other Ohio locations.

C. Beachwood, Ohio.

D. McKnight Road (Pittsburgh).

E. Upper St. Clair (Pittsburgh).

F. Monroeville (Pittsburgh). White specifically directed DeSimone to open a testing site in Monroeville.

34. DeSimone spent substantial time and effort dealing with landlords to obtain leases for each site.

35. DeSimone spent substantial time and effort to obtain the required zoning, building and occupancy permits for the new sites.

36. DeSimone spent substantial time and effort to obtain the required licenses and permits for the sites. Among other things, DeSimone was required to deal with both state and local officials in Ohio and Pennsylvania. DeSimone also engaged lobbyists to help with the issuance of the permits.

37. DeSimone spent substantial time and effort dealing with the Department of Health to obtain Laboratory Licenses known as Clinical Laboratory Improvement Amendments (CLIA) Certificates.[2] In connection with the same, DeSimone engaged a licensed physician to assist with the CLIA process.

38. DeSimone spent substantial time and effort to advertise and market for the testing sites and engaged marketing firms (TenFour Marketing and Corkboard Concepts) to assist with advertising for the sites.

39. DeSimone spent substantial time and effort to staff the sites.

40. In addition to his efforts to open the sites, DeSimone expended substantial time and effort to manage the sites and made himself available twenty-four hours a day and seven days a week.

---

[2] The Clinical Laboratory Improvement Amendments are codified at *42 U.S.C. 263a.* The CLIA sets forth Federal standards applicable to all U.S. facilities or sites that test human specimens for health assessment or to diagnose, prevent, or treat disease.

41. In addition to his time and efforts, DeSimone incurred substantial out-of-pocket costs to get the sites up and running. Such expenditures included costs for:

A. Contractors and subcontractors.

B. Construction supplies.

C. Advertising and Commissions for hiring of employees through Indeed.com.

D. Lab permits

E. Hotel, Travel and other related expenses.

**The six (6) testing sites generated substantial profits for the Defendants:**

42. DeSimone believes and therefore avers that the Defendants' operation of GS Labs generated more than $1 billion in revenue and that Defendants have collected more than $400 million of that amount.

43. The revenues from the six (6) testing sites opened and operated by DeSimone substantially contributed to the profits earned by the Defendants.

44. In fact, the six (6) sites opened and operated by DeSimone administered 43,600 Antigen and PCR tests. In addition, the six (6) sites have administered numerous antibody tests.

**Defendants' promises of payment go unfulfilled:**

45. Although DeSimone performed his end of the bargain, the Defendants failed to pay DeSimone under the terms of the agreement.

46. Instead, the Defendants continually promised DeSimone that payment would be forthcoming.

47. Despite such promises, no payments were ever made.

**COUNT 1:**

**Breach of Contract**

48. The Plaintiff hereby incorporates paragraphs 1 through 47 above as if set forth in their entirety.

49. As set forth above, the parties agreed upon all essential terms to form a binding agreement.

50. The law is clear that the required elements of a binding contract are an offer, acceptance and consideration, also known as a bargained-for-exchange. See, *Toppy v. Passage Bio, Inc.,* 2022 Pa. Super. 190, 285 A.3d 672 (2022); *Johnston the Florist Inc. v. Tedco Construction Corp.,* 441 Pa. Super. 281, 657 A.2d 511 (1995); *Mastroni-Mucker v. Allstate Insurance co.,* 2009 Pa. Super. 101, 976 A.2d 510 (2009).

51. All of these elements are present here.

52. The Defendants offered to compensate DeSimone for his efforts to open and operate the new testing sites.

53. DeSimone accepted the offer by his performance. See, *First Home Savings Bank, FSB v. Nernberg,* 436 Pa. Super. 377, 648 A.2d 9 (1994) and cases cited therein. See also, *Restatement 2d of Contracts, Section 53.*

54. DeSimone completed his end of the bargain by opening and operating the new sites.

55. The Defendants received their bargained-for-exchange: the profits from the new testing sites.

56. The Defendants breached the agreement by their failure to pay DeSimone for his efforts as agreed.

57. Accordingly, DeSimone has asserted a valid claim for breach of contract. See, *Meyer, Darragh, Buckler, Bebenek & Eck, PLLC v. Malone Middleman, P.C.,* 635 Pa. 427, 137 A.3d 1247 (2016), holding that an action for breach of contract requires "a contract, a breach of the contract and resulting damages."

58. All of these elements are present here.

59. DeSimone has suffered substantial damages as the result of Defendants' breach in that he has been deprived of the payments due to him under the parties' agreement.

60. DeSimone's damages are in excess of $2 million.

Wherefore, the Plaintiff respectfully requests this Honorable Court to enter judgment in favor of the Plaintiff and against the Defendants for compensatory damages flowing from the Defendants' breach to be established at trial (in excess of $75,000.00), plus interest and costs of suit and to grant any other relief that is equitable just and appropriate.

## COUNT 2:

### *Quantum Meruit* (in the alternative)

61. The Plaintiff hereby incorporates paragraphs 1 through 60 above as if set forth in their entirety.

62. In the event that the Court finds that there is no enforceable contract, then DeSimone is entitled to a recovery in *quantum meruit*.

63. The law is clear that:

> An action in *quantum meruit* sounds in quasi-contract or contract implied in law and seeks the equitable remedy of restitution where one person has been unjustly enriched by the services of another.

*Meyer, Darragh, Buckler, Bebenek & Eck, PLLC v. Malone Middleman, P.C.,* 635 Pa. 427, 137 A.3d 1247 (2016). See also, *Shafer Electric & Construction v. Mantia*, 626 Pa. 258, 96 A.3d 989 (2014).

64. The Defendants will be unjustly enriched if they are not required to compensate DeSimone for opening and operating the test sites in Ohio and Pennsylvania.

65. A successful plaintiff in a *quantum meruit* case is entitled to recover the reasonable value of the services that he has performed. See, *Shafer Electric & Construction v. Mantia*, 626 Pa. 258, 96 A.3d 989 (2014). See also, *Artisan Builders, Inc. v. So Young Jang,* 2022 Pa. Super. 36, 271 A.3d 889 (2022):

> "[q]*uantum meruit* is an equitable remedy, which is defined as 'as much as deserved' and measures compensation under an implied contract to pay compensation as reasonable value of services rendered." *Id.* at 508 (Pa. Super. 2016) (citation and alteration omitted). *See also Commonwealth Dept. of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 397 A.2d 779, 782 (Pa. 1979) (*quantum meruit* is "the reasonable value of the services performed").

66. DeSimone believes and therefore avers that the reasonable value of the services that he performed for Defendants is in excess of $2 million.

Wherefore, the Plaintiff respectfully requests this Honorable Court to enter judgment in favor of the Plaintiff and against the Defendants for compensatory

damages flowing from the Defendants' breach to be established at trial (in excess of $75,000.00) , plus interest and costs of suit and to grant any other relief that is equitable just and appropriate.

Respectfully Submitted,

_/s/ James R. Cooney________

JAMES R. COONEY
PA I.D. #32706

RYAN J. COONEY
PA I.D. #319213

PAUL R. TOIGO
PA I.D. #326991

COONEY LAW OFFICE, LLC
Benedum Trees Building
223 Fourth Avenue, 4th Floor
Pittsburgh, PA 15222
(412) 546-1234 (phone)
(412) 546-1235 (facsimile)
jcooney@cooneylawyers.com
rcooney@cooneylawyers.com
ptoigo@cooneylawyers.com

## CERTIFICATE OF SERVICE

I, James R. Cooney, hereby certify that on the 13th day of November, 2024, a true and correct copy of the foregoing **Amended Complaint** was served upon Counsel for the Defendants by E-mail addressed as follows:

Daniel J. Twilla
Gordon, Rees, Scully, Mansukhani
707 Grant Street
Suite 3800
Pittsburgh, PA 15219
*dtwilla@grsm.com*

Robert W. Futhey
Fraser Stryker PC
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102-2663
*rfuthey@fraserstryker.com*

*/s/ James R. Cooney*____________
JAMES R. COONEY